May it please the court, my name is David Abney here representing Emmitt Thompson. I've been going over the briefs pretty heavily the last week and especially last night I read the answering brief and I thought oh my god I lose. Then I read my opening brief and I said oh joy I win. The difficulty is the there's a conflict, very heavy-duty conflict of facts here and in order to unravel that conflict you have to consider the weight of the testimony, the credibility of the matters that on a summary judgment level the trial judge cannot do. It has to go forward to let the jury unravel all the conflicts of evidence, credibility, and weight of the testimony. Dr. Thompson established that he belonged to a protected class and established that he was subjected to an adverse employment decision. The difficulty as far as the crime effect he faced and comes down to whether he performed his job duty satisfactorily and there is a conflict about that. In his own testimony and he said that he did, self-assessment alone by itself is just not enough unfortunately, but he did recently well in the performance improvement plan. The odd part about that is that even though there was documented improvement the performance improvement plan was not even considered at the decision when the decision was made to not renew him. Mr. Abbey, one of the questions I had about that really related to the fact that there appear to have been different sources for the negative evaluations of Dr. Thompson and what are we to make of that because it appears that that potentially significant here where even after the performance improvement plan is implemented there appear to be different doctors who raise an issue with the performance of Dr. Thompson. So what is there in the record that would rebut those negative evaluations in the context in the performance plan? Where can you point us to in the record because in this a fairly extensive record I want to make sure that we're not missing anything as you as you point out. Well one point was Dr. Fife's I'll try to I'll get to page of the opening brief I don't have that right in front of me. Also we had expert testimony by Dr. Sheffrin that in her opinion after reviewing all the evidence that what Dr. Thompson had supposedly done that was deficient was not sufficient to support non-renewal and that in fact he should have been renewed. We have we have a good a better than two members in the residency class performance on the right examination the residency and service training examination. So we've got and also we've got a very odd sort of negative piece of evidence. There's a specific statute in Arizona that requires medical practitioners to report someone who is whose conduct has fallen below the standard of care and that is what Barrow Neurological was saying about Dr. Care. But there was never any report to the Arizona Medical Board which is a very telling circumstance. If he had been doing as badly as they claim there should have been a report. Why wouldn't we potentially attribute that to them trying to give him an opportunity the best opportunity to be able to improve his conduct and not wanting to before they made the decision solely his If that were the case then why when the California Medical Board asked about him they reported that he had been terminated that he had been on probation both of those are falsities and then when the California Medical Board asked for more information they they got a crashing nothing. There is evidence here that was presented about the discriminatory intent. So it's it's so easy after the fact to come back and say well jeez no you were probably the worst physician we've ever seen on the face of the planet but they brought him in from Meharry College which is a very respected medical college in Nashville and they put him in the second level not that the opening level of this residency class but at the second level because they thought highly enough of him to let him try there although quite frankly in I think an expression of professional humility Dr. Thompson said no I want to start at the bottom of the because we do we seem to do things differently in Meharry. Meharry is more of a nurturing program more of a collaborative let's let's work together to make sure this physician succeeds kind of program as opposed to Barrow Neurological Institute which at least the way that portrayed by Dr. Thompson is more like something out of the animal house hazing that they're not really really there to help you to succeed they're there to test you hard and see and see what you're made of which is fine I suppose you know in some programs that will work but Dr. Thompson said well you know I've got some learning disability issues here and I don't want to start right in the middle but that's where they started and so he presented he presented considerable evidence that he was performing satisfactorily especially and I would like to emphasize that the expert testimony and that's of course that's and it's a separate but a related issue as far as what happened with the expert the experts not perfect I mean it'd be nice to have a I would have loved to have a better expert than the one he had but he did what he had what he had certainly a very distinguished and experienced neuro neurologist who had been through this kind of program herself and certainly worked in residency programs and residents and had a good idea of what's up and what's not so why wouldn't it be though appropriate to reject those aspects of the experts testimony that were essentially placing herself in the shoes of other individuals when when not being present observing Dr. Thompson because it seemed to me that there are some real issues about first speculation about conduct and performance when the experts not even present at these particular moments and they're very fact-based conclusions it would be nice to have an expert there when when the car crashes it would be nice it's nice to have somebody there watching it all but you have to look at it when there's a car crash you can actually through certain scientific methods reconstruct the facts of what happened the expert here appears to have simply tried to divine what were the reasons for the evaluation without really being able to point to anything else right that would suggest that that there was a factual difference is there somewhere in the record we can look to that would identify what were the sort of factual basis for the expert making those those types of determinations about the the inaccuracy of the evaluation well I devoted a long section in the opening brief to the expert issue it's because and that's toward the end of the opening I think was probably the last issue what she did was examine all the documentary evidence that she had although a lot wasn't provided and what had been said and reported by Dr. Thompson and all the evidence that was available to her and she did what all experts do even in an accident reconstruction for a car crash you have to take the bits and pieces and put them together into a theory of what happened and her theory of what happened was from the start he was subjected to unequal uneven treatment things that he did supposedly did that were long orders that weren't written properly tardiness the emergency room brouhaha that they had all these different incidents she went through them and said well this is not how you should handle these sorts of things and it's it's it's evidence that that the non-renewal was indeed improper he should have indeed been renewed you know it's discrimination is one of the hardest things on the planet to prove and here we are you know you had a case earlier today about the discrimination I guess a foreign government discriminating you know here we are centuries after Europeans came to the miscontinent and we're still all messed up on discrimination one reason why these cases really require whenever possible for a jury to look at because there's there's differences of opinion to what these facts mean he looked at the way he was treated in a certain way based on his experience and and saw discrimination social discrimination practical discrimination difference in stake as opposed to other people making mistakes and and provided evidence to that and and of course for a thorough thorough neurological instance it says well we've got this other kind of view of what's happened here when we get this kind of situation where there is this fundamental collision of facts we need to let the jury decide you know nobody has got perfect facts here and in a situation like this the jury really ought to figure out what's going on I can talk about different aspects of the case but if there's no questions I'd prefer my reserve my time and stand on the brink for the other aspects all right thank you thank your honor let's hear from you miss Fiona good morning your honors Lindsey Fiore on behalf of Barrow Neurological Institute and may it please the court your honor we respectfully submit that the district court properly concluded that dr. Thompson had not presented sufficient evidence evidence to establish a genuine issue of material fact as to his title 7 infection 1981 claims there is an overwhelming amount of evidence in this case that dr. Thompson had serious performance deficiencies during his tenure at Barrow a dozen different physicians as your honors have alluded to identify concerns about dr. Thompson's performance about his medical knowledge ability to synthesize information the ability to formulate diagnoses and plans for patients and his lack of insight into his own deficiency as part of Tom dr. Thompson's prima facie case must establish that he was performing his job duties satisfactorily he hasn't done that he has made in fact multiple admissions in this case that would establish that he wasn't dr. Thompson has admitted that he engaged in the conduct for which he received written discipline dr. Thompson testified in his deposition that he did display some of the concerning behaviors at his attending positions reported just memory loss and an inability to formulate plans for patient admits he was a slow learner I want to address some of the points that mr. Abney made as to evidence that dr. Thompson claims he was performing satisfactorily he alleges that he performed better than two of his colleagues on the right exam the residency and training exam dr. Thompson testified that he didn't know that to be true he didn't know what their scores were or even who those two people were he and I in contrast presented evidence to the court on summary judgment but dr. Thompson in fact finished last of the worst score of anyone in his class dr. Thompson relies on an email from dr. Fife one of his attending physicians that suggests that he would like dr. Thompson's contract to be renewed your honors review that email it doesn't exactly say that but more importantly the email is part of a longer string in which dr. Fife expresses his own concerns about the serious dr. Thompson's performance dr. Thompson has also suggested there's evidence in the record that he was performing well on his performance improvement plan we are not aware of that dr. Thompson has cited to the position testimony of dr. shoot as evidence that he was performing well on in fact wait a minute council on that last sentence you kind of cut off for a minute oh I apologize your honor dr. Thompson has alleged that dr. shoes his associate program director testified that he was performing well on the performance improvement plan the testimony that he cites to in the record does not establish this and in fact what dr. shoes said in that deposition excerpt is that she maintained serious concerns that he was not meeting the obligations of the performance improvement plan primarily in the area of his inability to accept that he had deficiencies and to learn and improve from them dr. Thompson did not dispute dr. Thompson disputed only eight of the statements of the district court even if and by the way your honors I believe that dr. that mr. Abney has sort of conceded that dr. Thompson's own assessment of his performance isn't sufficient evidence to the extent there's any case law to the contrary which would be the Aragon case that was a case where the police had no evaluations that were negative and no written disciplinary actions and he could he was performing satisfactory based on evidence that he presented of his meeting certain timing and production standards dr. Thompson doesn't have that same evidence here all he has is his self-assessment and in the face of the significant evidence that he wasn't performing satisfactorily it's not sufficient to state an issue of fact for a jury can I have you come so address the defamation claim why isn't it a jury question as to whether there is a difference between termination dismissal and expulsion versus non-renewal of course your honor as an initial matter dr. Millay who filled out the form that is a question testified as to how he interpreted those terms to be as to their ordinary meaning what happened to dr. Thompson is this he was part of a three-year residency program he did not complete the full three years is there any any evidence other than what what dr. Mollie testified to because the question of whether something is true or not is determined objectively so why does dr. Mollie's subjective opinion really matter as to that question well your honor I think his opinion is important when you think through the context of the information had before him which was that dr. Thompson didn't commit didn't finish the program but dr. Thompson was asked to leave before the end of his first or his second year but his first year with Barrow it's a program that ended in in the end of June and dr. Thompson but miss Fiore if we're actually having to consider these various facts does that not support the plaintiff's argument that in fact this should be a jury deciding and weighing these facts as relate to the defamation claim if you need to provide us context to understand why a non-renewal is equivalent or substantially the same as a termination or dismissal your honor the Supreme Court of Arizona has addressed this question that is the read case which is in our answering brief the standard in that case that is presented is whether the statements that were allegedly defamatory are quote substantially in that case is particularly instructive because in that case statement at issue was that the convicted of firing a weapon in fact the plaintiff had been convicted of displaying a weapon there are stark differences between those two the court said that the sting of the statement was the same could you repeat your last sentence I can't hear you half the time it's fading out I apologize your honor let me stand a little bit closer to the yeah I think you move back and then and then I lose it sure I just come closer to the microphone how's this good better okay my apologies judge Fernandez I was referring to the read case that is cited in our answering brief it is the Supreme Court of Arizona decision as to a defamation claim and what that case holds is that if the alleged defamatory statement is substantially true a defamation claim cannot proceed and that case is particularly instructive because in that case the statement at issue was that the plaintiff had been convicted of firing a weapon in fact the plaintiff had been convicted of displaying a weapon and despite the differences in those two types of convictions the court held that the sting of the statement was the same dr. Thompson's complaint in this case alleges in multiple different paragraphs that he was terminated from the program in addition the form asks whether dr. Thompson was terminated dismissed or expelled he left a month early he did not finish a three-year program and he did not even finish the first year of his residency but within the there is no question for a jury to conclude differently than that termination is a substantially true description of what happened to dr. Thompson's probation claim. Dr. Thompson has alleged that the phrase probation was false because graduate medical education standards have a specific definition of probation if you look at the form that dr. Millais filled out which is part of this record there is no instruction that the word probation should be defined in accordance with that particular definition. The form also asked about non-renewal right wasn't that his situation was a non-renewal so there is both asked about probation termination expulsion and in a separate question also asked about non-renewal. Yes your honor the form is actually a checklist of yes or no questions and there are multiple questions one of them is whether he was on probation one of them is whether he was terminated one of them is whether he was not renewed but your honor to suggest that the presence of the non-renewal question means other items should not have been marked would be a presumption that those things are mutually exclusive there certainly could be. I don't I mean I don't take judge Wynn's question to be that that's the case the question is whether or not we should be deciding that or the district court should be deciding that versus the jury deciding that given the context of the form that to me is not to speak for my colleague but that to me is one of the main parts of that question is about deciding whether or not we should be reversing based upon the fact this should go to a jury. Judge Borwell has it exactly right I couldn't have stated it better myself really that's that's really the question is this a fact determination that the jury is entitled to make or put it differently can a rational juror conclude that there is a difference between termination being on probation versus non-renewal and I think you know the medical word did ask for follow-up and Dr. Tomoli didn't provide it so that that's a troubling fact that may provide some context for the jury to make a determination as well. Judge Wynn I'd like to address that briefly because this is not part of the record in this case or at least not part of the record that's before the court although I would certainly be happy to provide that information supplementally to the court if it would help or the court requests it. Barrow Neurological Institute did respond to the California Medical Board multiple times providing Dr. Thompson's entire file to them so they could have the entire context of why that form was filled out the way it was. In addition your honors again the substantially true statement or potentially true standard is the appropriate standard here and the question of whether someone could objectively find that the word probation is not a substantially true description of what happened to Dr. Thompson is not a question for the jury and beyond that your honor we alluded to this in our brief and also argued it before the district court there's an alternative basis to find Dr. Thompson's defamation claim not continued and that is the conditional privilege. Mr. could you repeat that we you broke up that last sentence it wasn't really the volume but you see broke up a little bit could you repeat that last sentence please? Sure your honor there is an alternative basis which we argued before the district court for finding that Dr. Thompson's defamation claim cannot proceed and that is the conditional privilege that applies here. There is a common interest privilege that applies when one party is making a statement to another party in the context of information that's been requested and which the other party has a right to know. This was provided in a footnote in one of our in our answering brief your honor that is another basis of finding that the claim cannot continue. There was a common interest between Barrow Neurological Institute and the California Medical Board to provide information relating to Dr. Thompson's tenure at Barrow. We submit that this conditional privilege applies and that Dr. Thompson hasn't submitted sufficient evidence to show some sort of things a belief that on the part of the person who made the statement a reckless indifference to the truth which Dr. Millais testimony very clearly establishes he did not. All right thank you counsel. I would like to turn very briefly to the contract and actually the expert motions your honor. The expert report has been was almost entirely excluded by the district court. The standard of review is abuse of discretion and while there are certain opinions in there that perhaps might have shed some light on the performance deficiencies or the veracity of those performance deficiencies. The district court actually went through and said that even if the report had been different in part in large part because Dr. Sheffrin's ultimate conclusion was that Dr. Thompson should have been given an opportunity to repeat his second year. That opinion does not go so far as to say that Dr. Thompson never should have been put on a performance improvement plan. It doesn't go so far as to say that Dr. Thompson never should or should have been allowed to go on to his third year. The fact that her opinion was that he should have been allowed to repeat even if admissible it's just further evidence that he was not performing satisfactorily. And as to the contract claim your honors given that I only have a few seconds left we're happy to rest on our briefs unless the court has questions which I can answer for you. It doesn't appear that we have any questions. Thank you very much. Thank you your honors. Ms. Dabney you have some rebuttal time. Thank you your honor. Just an audio check again if I may. Can you hear me okay? Yes. Okay thank you. I'm sorry. I hate to be just sitting here with my lips moving and nothing else happening. If I'm a few words about the defamation claim this notion that they had provided the entire file of the California Medical Board and that there was a lot of correspondence going about that's absolute news to me. I never heard anything about it and there's nothing about it in the record anywhere that I know of. What's in the record is that the California Medical Board asked for the information had a form several places to check that they put down the check that he had been terminated that he was on probation. There was also a place a separate box for non-renewal and they didn't and then when the the California Medical Board came back and wanted information there was nothing. They and they said in fact that they didn't have any duty. They refused to respond and they told Dr. Thompson that they don't have any duty to respond to inquiries from licensing authorities and so they didn't do it. And I know that the judge bore had some questions about the expert as to where the different opinions were. It's it's actually pages 47 to 61 of the opening brief and I go episode by episode and point by point with the the expert talking about the different incidents and her understanding as an expert as to what was the appropriate thing to be doing with Dr. Thompson and what he had done. There was an incident about the Parkinson's, stroke workup, failure to put a patient's name on a sign-out sheet, complaints about logistical issues, minor errors that had been made, reviews of patient notes and I can go I could go by a point by point by point but I would bore everybody to tears. It's it's there in writing and it's it's a pretty good you know for once I wrote something fairly clearly pages 47 to 61 of the opening brief. I devoted a lot of time to it because it matters because it's not just his own self-assessment and not just specific points about how he did on an exam and how we did on the performance improvement program and what Dr. Fyatt said about Dr. Thompson but the expert matters a lot in a case like this because the expert can crystallize everything to still go through all the different exhibits depositions the record and say here's the different points where we see that Dr. Thompson is performing well that he's being unfairly criticized for what he has done and it's in a case like this it's very important to have that kind of expert testimony so we can all understand. I don't know if anybody on the panel is a neurologist and I know I'm not but at least it brings it together. It's a difficult case. There's it's it's not it's it's he said she said he's anyway if there's this conflicts of testimony here there's conflicts of facts and there's conflicts of opinion and I would recommend to the defamation is one of the starkest points but it when we get into the murky area of the prima facie case and pretext then this really is a matter that should go to the jury especially in light of what I submit to you was understandable reasonable expert opinion testimony. It wasn't perfection. I've only had one perfect expert in my entire career and God bless him but all the others have decidedly imperfect. There's one point I was my colleague across the aisle said that I conceded that self-assessment is is no really evidence or it's not good evidence and it is good evidence it's just you can't rest your entire case on a self-assessment and we did not do that here. If there's no questions from the court I wanted to thank you for your time and give my extra time back to the court. All right thank you very much counsel for both sides for your argument today. The matter is submitted and we'll issue a decision in due course. That leaves one matter on the calendar Renegaux versus Plains pipeline which the court had previously taken under submission. So that concludes our court session for today. We're in recess until tomorrow morning.
judges: Fernandez, Nguyen, Boulware